Before we begin this morning, I have a pleasant motion to offer. Judge Bryson, I move the admission of Megan Friedland Raymond, who is a member of the Bar and Good Standing of the Highest Court of Massachusetts. I have knowledge of her credentials, and I am absolutely satisfied that she possesses the necessary qualifications. Judge Mayer, your motion is granted, and the applicant will be admitted. You may now step over to the clerk, who will administer the oath of office, but before you do, on behalf of the Court, I want to extend a warm welcome to you, on behalf of all of us, to the Bar of this Court, and look forward to seeing you in the future. Please raise your right hand. We swear and affirm that you will report yourself as an attorney and counsel to this Court, uprightly and according to law, and that you will support the Constitution of the United States of America. Congratulations, and welcome to the Bar of the United States Court of Appeals. The first case this morning, 051555, Meat Instruments Corporation v. Yonkon Incorporated. Thank you, Your Honors. May it please the Court. How do you pronounce your name, sir? Sorry, Peter Afrasiabi. Afrasiabi, okay. Thank you. May it please the Court. This Court respectfully should reverse the District Court, because the District Court was wrong when it concluded that for something to constitute information or data, it must reside or exist in a database, and there are two fundamental reasons why that claim construction was wrong from the District Court. The language we were dealing with, with respect to Yonkon's summary judgment motion, was the claim language of column 12, lines 7 through 13, which dealt with data being correlated with three-dimensional... Let me interrupt you right at the outset, so that we're all on the same page here. If I understand the District Court's claim construction, it wasn't that data in the abstract needs to reside on or be present in the database, but rather, for purposes of the claim language in this case, the data referred to in the claim must be data that is found in a database, and I think the language of the claim that the Court was referring to is an electronic database containing data about the predetermined subject, the data being arranged in said database. Now, that, I think, if I understand correctly, is what the District Court was using by way of reference to the term data, that is to say, data in said database, for purposes of the claim. Yes, Your Honor, and that fundamentally is where the District Court strayed with all due respect. That language you referred to is with respect to the claim limitation of a database that does contain data. The issue, though, is two paragraphs down where it refers to the requirement of providing data. It doesn't say providing database data or data from a database, and if you look, for example... Well, the next paragraph says providing data from said database to a user. Exactly. Absolutely. And the Dependent Claim 2 refers to database data, so the patentee certainly knew how to refer to that subset of data, which is database data in the paragraph right above the one I'm addressing, and in Dependent Claim 2. And I think what that shows is that data, to constitute data, can be in a database, but it must not be in a database also. And this is much like the Phillips en banc opinion from this Court that dealt with steel baffles, and the fact that the use of the modifier steel with respect to the word baffles demonstrates that baffles are not inherently imbued with the substance of being steel. So in the whereby clause, whereby the provided data in the last clause, that data, you interpret that as not being the provided data a reference back to means for providing data? That is correct, Your Honor. It refers to the data being provided, which could be database data, i.e., this is Saturn the sixth planet from the sun, or it could be the arrow. So you say the provided data in the last clause is not a reference to output means for providing data from said database? That's correct, Your Honor. And it was, with all due respect, that issue in footnote 3 where I think the District Court took this database data element and held that in order to be data you have to be in a database. Fundamentally, when we're talking about output from this device and it tells you you're looking at Saturn the sixth planet from the sun, or I think the example Mr. Crockett used before the District Court was this is Betelgeuse, that is provided because a calculation has occurred. It's occurred and determined, and excuse me, I don't mean to point at Your Honors, but if one is holding the device here and it tells you the device does its calculation and it concludes that within the field of view of this device, it's now looking at Saturn, a calculation has occurred to trigger the presentation of that information much the same way that when you're holding the device here but you want to get here, it says arrow, or it gives you an arrow, or you need to get an arrow. But isn't the point that the District Court was making that the information about either Betelgeuse or Saturn is information that was initially loaded into the database? That is to say, you would have Betelgeuse in the constellation Orion or whatever, in the database and arranged in the database in that sense as opposed to information that would have a calculation done depending on the particular circumstances. That is to say, the database is in a sense a look-up table. That's what the District Court held Your Honors. Right, and why isn't that a fair construction of this claim? Well, for the reason I first gave, which is data isn't limited to database data, just text or the language. And number two, when you look at the specification on the column six lines 45 to 50, it's specifically talks about output from sensors. So the sensors are working, they gather information, and that output is specifically discussed in the specification as being information. And so you have the District Court's construct which expressly doesn't comport with the instrument as a whole when information is being referred to in the specification as being output from sensors. And the District Court, although not in its order, but in the oral argument, which was obviously provided and cited to this court, made the distinction that, well, a computation is occurring when Your Honors' example is given, one looks at Saturn and it's unique each time and whatnot. But, for example, the information itself, which is in the database, this is Saturn, isn't it actually in the database? And that was undisputed. What's in the database is a bunch of zeros and ones. Well, yes, but that's always true. If you have a database that contains my age, it doesn't have the number that we normally associate in an analog system. It has a digital number. But that, it still is going to be a fixed number which varies from year to year. But that is not, that is the kind of thing that you would say is database information. It isn't the product of a calculation the way the information as to where the machine is pointing at any given time would be. And just as Your Honors' age is changing every day or every year, trajectories of planets are changing all the time. Within our lifetime, it's undisputed in the record that the celestial sphere with respect to stars doesn't change in any significant way. So you program the data and it's fixed. It depends on the star. Some of them move a little more than others. But go ahead. Within reason, but planets are moving all the time. And so that is programmed in, a trajectory is programmed in. And the device does its calculation and tells you where that is. But it's the same thing when the device gets data from where it's pointing from the sensors, applies an algorithm that's in the database that just simply computes where the device is pointing, where it wants to go in the celestial coordinate system, and computes the difference and gives that back as an output. And the output's an error or the output is you're at Sirius. And so it's for that reason that we believe the district court error with respect to that claim construction. And I think it's important also to look at this device in the context of the prior art which was discussed at length below. And that is, it did not come out of a crowded field. The one response to the office action which has been discussed at length in the briefs and I won't repeat it all, simply makes the point that this device is able to know where it's, this handheld device is able to know where it's pointing and where it needs to go. And it can get someone between the two. And the bridge between the two is the arrow. And that's what the knowing aspect to this invention is. It's the arrow. Of course that's, the arrow in a device has been used for a couple of decades on telescopes. You align the telescope on two stars and then you get your arrow pointing as to where to go. So none of that is new. The only thing that's new is the idea that this can be done with a handheld device. With handheld and this was also what it was doing that was different is it wasn't, it's not requiring a two star or one star alignment. This was gauging, taking two takes, much like means level and point north technology, which is you level it to the horizon and it takes a reading of the altitude and then it takes a reading off magnetic north. And with those data points and the data about the time, the date, where you are on the planet Earth, it's able to put you in the celestial, in the cosmos, in the celestial sphere. So with the context of the handheld, yes that was a radical advance. Vis-a-vis the prior sort of handheld celestial devices that existed, such as a plate one would hold up to the sky, that required you to know exactly where to hold it up to try to line up and find the stars of a constellation. What about the provisions in the claim that talk about automatically and simultaneously presenting information to the user? Absolutely, your honor. That's the second issue that's obviously addressed in our brief. And there we would submit a disreport error, because this requirement that the device present information to the user while the user is viewing, the disreport added a gloss of this idea of awareness, or the user has to be aware of the information at the exact moment of viewing. And so this leads down a thorny path, because the reality is if I'm looking at the constellation of your honors  I can talk with my eyes back and forth, but there's a serial viewing that's going on, and you have, and the disreport said, well no, because this is on the side screen. There's a difference, is there not, between something that is within a field of view on a screen, even though you may be focusing on one aspect of that screen as compared to the other, and observing something on a separate screen, where you have to sort of take the device away from your eye, and look to the side to get an image. And isn't that appropriately what is described in the claim as automatically and simultaneously presented to the user as the user observes the field of view? Doesn't that suggest that the information is on the screen that the user observes within the user's field of view, rather than on a separate screen? No, Your Honor, for this reason. Dependent Claim 5 talks about providing a real-time reference display on the field of view to the user, and within the field of view. And so what I think happened by the district court's construction is it sort of made that dependent claim co-terminus with the independent claim. So the proper way to construe it is that the information has to be given, yes, while the person is viewing, but not necessarily within the field of view. It can be within or without the field of view, or it can be auditory or not. And the only true way to make it absolutely simultaneous would be auditory. But that, too, is a dependent claim. Dependent Claim 2. You're well into your rebuttal time. Do you want to save some? I will happily save the balance for rebuttal, unless the court has any further questions. Okay, thank you. Thank you. Mr. Crockett. May it please the court, this case involves a straightforward issue of claim construction. The district court construed the limitations that were necessary to determine non-inclusion in the construction of the device was executed. The district court determined that the claims required that the device present information about the data or about a celestial object to the user as the user is observing that field of view. According to plain language of the claims, the specification, the arguments, and the prosecution history, the claims are directed toward a device that can tell a user something about an object that the user is looking at through the object while the user is still looking through the device. Given that the Ampton display is perpendicular to the viewing axis, it makes it impossible to meet those limitations. So whether in the context of claim 15, the method claim, or the device claim 1, it's not possible to meet the simultaneous presentation limitations. Now, as I understand the arguments, you need to prevail not only on that point, but also on the data issue, because otherwise the arrows, if the arrows constitute data, there's no doubt that the arrows are presented simultaneously to the user, correct? Yes, Your Honor. So if Meade is correct with respect to the argument that counsel made with respect to data, then there is infringement. There are two modes of operating the device. One is in the identified mode, which is the mode that is covered by the claims. And the other is the finder mode, and the finder mode would infringe. Dealing with both modes, all I need to establish and uphold non-infringement on the identified mode is affirmance on the simultaneous presentation of the user limitation. The claims aren't directed toward the identified, I'm sorry, the claims aren't directed toward the finder mode, but to uphold the finding on that, then we need affirmance on the fact that the data must be subject to the other limitations on the claims that dictate where that data has to be stored, when that data has to be called up. And that is the basis for the judge's decision that the claims do not cover the finder mode. The description of this patent is exclusively, insofar as it talks about presenting textual information and graphics, it's exclusively focused on image overlay. Of the paragraphs in the text that talk about image overlay or data presentation, they're all discussing the mechanism by which the device provides the image overlay. Well, there is a reference to oral presentation as well. Yes. In the last paragraph of the patent application, there's a statement that says all of the above embodiments require image overlay. And then as an aside, it says you can present data with audio. No description of how to do that, but it's provided as an aside in alternative embodiment. So, given the fact that the accused devices do not have audio, that mechanism for providing simultaneous data to the user doesn't exist in the accused devices. Well, I gather that there's no dispute that the commercial embodiment does contain audio, correct? Yes. The commercial embodiment was not built until after the summary judgment and dismissal of this case by the trial court. Now, that being said, there is a number of ways to present audio data to the user without meeting the other simultaneous limitations that are met in Claim 15 and without meeting the simultaneous presentation between the user. The mere fact that a later device won't provide audio presentation of data does not dictate that it's going to happen simultaneously with the other limitations that have to occur simultaneously in Claim 15 or in Claim 1. As a matter of fact, that's not practically possible to do so. Given the interaction in Claim 15, the determining, sensing, and presentation steps all have to happen at the same time. Presentation of audio data is... This is about the next glossary. I'm sorry. But it's interesting. The presentation of audio data involves circuitry that does not appear to permit use of the magnetic sensing system at the same time within a handheld device. There's too much interference. So even if we had litigated that particular issue, the outcome of that would be uncertain. The judge included a footnote that stated that if the device had audio that was provided simultaneous with the pointing and holding steps, of course, we would meet that limitation. I think that's a fair statement of what the claims mean and also a fair statement of what would happen if we built a device to meet the claim element in that regard. Mr. Crockett, the Claim 1, in the paragraph talking about the microprocessor means, talks about providing data about the subject. And Mr. Afrasiabi, I believe, said to us a moment ago that that data is different from the data contained in the electronic database. Why has his interpretation of this claim been correct? Well, first, because that interpretation is contrary to the limitation added by the amendment to the claims. It required that the provided data be correlated with three-dimensional directions following the field of view. Well, of course, the computation that would illuminate the arrows is based upon and to that extent correlated with the three-dimensional directional orientation information. Is that correct? I don't think so. I think the provided data has to refer to the provided scanty antecedent basis. Well, it doesn't say the provided data. It says to provide data. Just to provide data, not said data or said data stored in said database. Yes, Your Honor. That would require a different meaning for correlated between the paragraph which requires storage and the database correlated with three-dimensional directions. And the data in that subparagraph where the data is correlated with three-dimensional directions, that would be two different, and I think drastically different, things that were correlated. So you're reading data to mean the data stored in the database wherever it appears in the claim. Yes, Your Honor, and that means that just follows the typical rule that the claim words should mean the same thing wherever they appear in the claim. And I think it's clear from the file wrapper and the specification that that is what is meant, that the device should be calling forth the data that has been stored in the database and stored in a manner that's correlated with the three-dimensional directions of the celestial objects. Of course, the indications of direction provided by the arrows, that information is never really stored in the database. That's always calculated as you go, right? Exactly. Yet that is provided to the user. That's a form of data, a form of information that's not stored in the database. So not all data has to be stored in the database. Correct? Correct. But the data described in this claim has to be stored in the database. There's no question that the... And I don't think that we argued in the trial court that the directional arrows were not data. Our argument was that directional arrows are not data that is subject to all the other limitations of these claims. So it did not matter that there was a purported dispute over the meaning of the word data and whether or not these directional arrows were data. The question is, do they actually... When you tumble through the claims and go through the claims, do they actually get processed in the way that's required by this claim? Which part of this Claim 1 describes the arrows? No part of this claim describes the arrows. So your position is that Claim 1 really doesn't... isn't directed to the finder mode. Correct, and that's one of the holdings of the trial court's order. Another reason that just becomes apparent is in the last paragraph, the user has to be seen in this directional initiative while the user is looking in this selected three-dimensional direction. Well, for the majority of the time the user is using the device in the finder mode, the directional arrows are telling the user something about an object that's not in the field of view. It's telling him how to move the device to get there. Thank you. I think also... Let me make sure I understand that last point. You say that this is necessary that the data be presented as the user observes the field of view, right? Yes. It doesn't have to be observing an object in the field of view. Yes, it does. And why is that? Because it has to be observing the field of view in a selected three-dimensional direction. That's the direction of the object that the viewer is looking at. And where do we get the definition of selected three-dimensional direction as being only the direction of a particular object as opposed to the direction that I choose to point the device at any given time when I begin my search? Or when I just... I pick up the device and I hold it like that. Yes. Haven't I selected a three-dimensional direction? Not in our device. In our device you have to push a target button. So pointing everywhere has no impact on the device. It's not until you push the target button that you get information on the object that would be aligned with the viewing axis. Well, okay. So I'm just trying to also go back to this question about the selected three-dimensional direction. The device is going to select a three-dimensional direction so that it knows where to go into the database to pull forth data about an object that's along that direction. So that's in the microprocessor's step. Well, if I aim the device at what looks like a blank area of the sky and I push the button, presumably the screen will remain blank, correct? If, in fact, there is nothing in that area of the sky. Right, nothing naked-eye visible. Yes. Okay, so I punch the button and nothing comes onto the screen. That would happen in that type of database. And you say that is not a selected three-dimensional direction because... why? Oh, no, you have selected a three-dimensional direction. Right. And if what I see instead is... Are you saying that I... Go ahead. You won't see anything. Right, I won't... You won't see anything. You will see... You'll have to turn the device and look down at the device. Look over it. Right, right. And I see a blank screen. And you would see a blank screen. Right, okay. So I know that I... Now, if I punch in Saturn... That's in the finder mode, yes. Right, in the finder mode. And I point again at the blank area of the sky that I just selected. Yes. Right. What I'll see are some arrows pointing me in a particular direction. So I guess my question is why isn't that a selected three-dimensional direction? That is to say the three-dimensional direction that I, the user, have selected in which, assuming that for present purposes the broader definition of the term data in which data is being presented to me on the screen. The arrow. Well, I don't think that that... Just pointing the device in any direction to see where it's going to tell you. I don't think that's a fair reading of the word selected direction. Well, who's doing the selecting? The user or the device? The device. Because of the automatic limitation the device is selecting the three-dimensional direction merely in response to changes in the orientation of the device. When you have selected in the finder mode Saturn and you just point it out in the direction in that case, even assuming that's a selected direction the device will tell you something about an object that is not in the field of view. So the claim interpretation straightforward claim interpretation tells us that that is not an encouraging situation. It will tell you about something that's outside the field of view and not in the selected three-dimensional direction. Okay. Now, with all these questions I think that looking at the remarks from the file wrapper makes it clear that the patentee was arguing exactly what these claims meant. He said it has to give data to the user about the object that the user is looking at through the device while it's doing it automatically, simultaneously without the user having to do anything. This is the import of a surrender in a file wrapper is, I think, unescapable. So, notwithstanding any argument that the claims might be stretched and interpreted to cover certain things I think that all the interpretations that we've been discussing here were clearly surrendered in the file history. And the interpretations that are urged by me are, I think, clear attempts to recapture what was given out by the file history. I don't think that should be permitted. When I read the file history remarks and the amendments that were made to Claim 15 and the amendment that was made to Claim 1 I get a very clear signal of what was surrendered in the file history. And insofar as the device takes advantage of those surrendered areas I think it's very clear that the patentee is stopped. Okay. Thank you, Jim. Very briefly, thank you. A couple of points, and I will take them, I think, in reverse order. And that is, the language Mr. Cronin just referred to had two footnotes in it. Footnotes indicated that the device doesn't just levitate and operate on its own to find something. It requires the user to press a button. And that doesn't negate any concept of automaticness, the fact that one has to press a button, much the same way one does with an automatic door opener. So that wasn't surrendered. The idea that this device, the M1 device, because it requires one to push a button in the identify mode when you're just scanning an area of the night sky and you just click to see what's there, that's still automatic. That wasn't given up. I think the second point, which is the first point addressed, was a discussion from Mr. Cronin about a new device that, from what I understand, is actually being made by another company now. It's not even between the parties here. It's had some changes in some way, shape, or form. And this is a set of facts that's really outside the record, and I don't think material there at all. So I'm at somewhat of a disadvantage in terms of discussing that issue with the court. And so I would conclude on one point, and that is one of the points I was talking about earlier, and that is when you look at the prior art in terms of what this device was doing with the arrows, to say that this invention claimed the ability to tell someone some data about Saturn but not how to get there in this find mode is a truly remarkable interpretation of the fact that it's a man. Particularly when you look at claim language, the specification that talks about the use of direction and indicia, such as arrows, to get someone to something that they don't know where it is. And that is a key aspect of this invention, we believe, that has been lost in the district court's construction. So unless the court has any further questions, we will submit. Can I ask just one technical question? Both sides have referred to Claims 1 and 15. In the district court, Claim 14 was referenced, but I didn't see any reference to Claim 14 in the briefs of the parties here. Are we talking about 1 and 15 only? We are. Okay, thank you. Thank you. Thank you. Case is submitted.